**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ASHLEY GERTZ, an individual; ALICIA SKARBEK, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>VANTEL PEARLS INTERNATIONAL/PEARLS IN THE OYSTER INC. d/b/a VANTEL PEARLS, a Massachusetts corporation;<br>JOAN A. HARTEL, an individual; and DOES 1 TO 10,<br><br>Defendants. | Case No.<br><br>**COMPLAINT:**<br>1. **DECLARATORY JUDGMENT – SECTION 17 OF THE CONSULTANT AGREEMENT**<br>2. **DECLARATORY JUDGMENT – NON-SOLICITATION**<br>3. **BREACH OF GOOD FAITH AND FAIR DEALING**<br>4. **BREACH OF WRITTEN CONTRACT**<br>5. **BREACH OF ORAL CONTRACT**<br>6. **FRAUD – INTENTIONAL MISREPRESENTATION**<br>7. **FRAUD – NEGLIGENT MISREPRESENTATION**<br><br>**[REQUEST FOR JURY TRIAL]** |

## THE PARTIES

1. Plaintiff Ashley Gertz is an individual residing in the State of Maryland.

2. Plaintiff Alicia Skarbek is an individual residing in the State of Florida.

3. Defendant Vantel Pearls International/Pearls In The Oyster Inc. d/b/a Vantel Pearls is a corporation with its principal place of business located at 111 Forbes Boulevard, Mansfield, Massachusetts 02048.

4. Defendant Joan A. Hartel is an individual residing in the Commonwealth of Massachusetts.

5. The true names and capacities of those individuals and entities sued as DOES 1 through 10 are unknown to Plaintiff who, therefore, sues those Defendants by such fictitious names. Plaintiffs will seek leave of this Court to amend this Complaint to allege their true names and capacities when ascertained.

6. Each Defendant has ratified and approved the acts of its agent and, at all material times, each of the Defendants were responsible in some manner for the acts, conduct, and damages, alleged in this Complaint with the cooperation and knowledge of each and all Defendants.

## JURISDICTION

7. This Court has Subject-Matter Jurisdiction pursuant to 28 U.S.C. § 1332, in that all parties to this action are residents of different States, and the amount in controversy exceeds $75,000.

8. Specifically, Defendant Vantel Pearls International/Pearls In The Oyster Inc. d/b/a Vantel Pearls is a corporation that is domiciled in the Commonwealth of Massachusetts, and Defendant Joan A. Hartel is also domiciled in the Commonwealth of Massachusetts. Plaintiff Ashley Gertz is domiciled in Maryland, while plaintiff Alicia Skarbek is domiciled in the State of Florida. Thus, complete diversity exists.

## STATEMENT OF FACTS

**Vantel Pearls International/Pearls In The Oyster Inc.**

9. Vantel Pearls International/Pearls In The Oyster Inc. d/b/a Vantel Pearls ("Vantel") is a multi-level marketing company – otherwise known as an "MLM" company – that manufactures and distributes jewelry containing pearls.

10. As with other MLM companies, Vantel markets and sells its products through a network of independent distributors (also referred to as "Consultants") who are remunerated pursuant to a "Compensation Plan," which provides for a structured series of rankings, commissions, and bonuses based upon their sales volumes and the sales of Consultants placed beneath them.

11. The individuals that are aligned below a particular Consultant are known as that Consultant's "downline" or "downline organization." The downline may also be referred to as a "genealogy."

**The Sign-up Process**

12. To become a Consultant for Vantel, an individual must access the Vantel website. From there the individual is directed to a webpage wherein he or she is advised to review, print out, and sign Vantel's "Consultant Agreement" and "Policies & Procedures." The webpage does not mandate the individual to actually access the Consultant Agreement and Policies & Procedures, nor does it require the individual to actually sign the documents before proceeding through the Vantel webpage. That is, an individual may become a Consultant without ever agreeing to any of the terms and restrictions set forth in Vantel's Consultant Agreement and Policies & Procedures.

13. After proceeding through Vantel's webpage, the individual is then required to submit contact information. Vantel enters this contact information into the company's database, creates a Consultant account, and assigns the new Consultant an identification number. After completing that process, the Consultant is then permitted to participate in Vantel's Compensation Plan.

14. Once the Consultant receives his or her identification number, a contract is formed between Vantel and the Consultant. The Consultant Agreement, Compensation Plan, and Policies & Procedures collectively comprise Vantel's "Distributor Agreement."

**The Inconsistent Terms**

15. According to Section 62 of the Policies & Procedures, Vantel may terminate its Consultants in the event of a violation of the Distributor Agreement. However, according to Section 17 of the Consultant Agreement, Vantel may terminate its Consultants for any or no reason at all. Thus, the Distributor Agreement contains conflicting terms regarding Vantel's right to terminate its Consultants. As discussed below, Vantel relies heavily on this conflict in order to commit fraud against its Consultants.

**The False MLM Promise**

16. Vantel entices Consultants to join its sales force through the offer of the "MLM Promise." The MLM Promise is a representation that if a Consultant works hard and builds his or her downline, then after a few years, the Consultant can sit back and enjoy a care-free lifestyle by living off the Consultant's residual commission generated by his or her downline organization. In addition, Vantel represents to its Consultants that their distributorship position is a business that they own, which they can work whenever and wherever they want.

17. The MLM Promise is an ongoing representation that is made via Vantel's marketing materials, training tools, live events, phone conferences, and even in Vantel's Policies & Procedures. For instance, in Vantel's "Opportunity Brochure," its owner and CEO, Joan A. Hartel ("Hartel"), states the following message to prospective Consultants in order to get them to join the company:

> "Vantel Pearls Team is so grateful to have this opportunity, this chance to *offer you something that can change the course of your life – in small ways and in earth-shattering ways*. All you have to do is believe. (*And work hard*)."

18. The Brochure also make the following representations:

> "It pays to be a Vantel Pearls Consultant! *Our Commission structure is built to reward you for building your business* and doing what you love!"
>
> . . .
>
> "Vantel Pearls offers the *opportunity to build a business that fits your life, on your terms.* A business that thrives when you add your own brand of personality, when *you make it uniquely yours*."

19. In addition to the foregoing, Vantel touts the following messages in its training tools and Compensation Plan:

> The Vantel opportunity offers *"unlimited" income*.

-4-
COMPLAINT

> . . .
>
> "[Vantel's] mission is to *offer an opportunity* for women to live a balanced lifestyle *while building their own business*, which will inspire them to *achieve joyous, authentic and abundant lives*."
>
> . . .
>
> "Start *your own business* today!"
>
> . . .
>
> "*Pursue a rewarding career* as a leader developing active teams."
>
> . . .
>
> "The Vantel Pearls *Career Path provides an opportunity for financial independence*."
>
> . . .
>
> "Personal sponsoring and meeting and forming new relationships including hosts and guests provides *an opportunity to build your organization* with personally sponsored recruits and is the basis for *your continued success*."

20. The representations referenced above are merely a small sample of what Vantel tells its Consultants to entice them to continue building their distributorship positions to a point of financial success. However, in reality, none of the representations are true.

21. For example, despite what Vantel represents, Consultants are not really given an opportunity to "start [their] own business" when enrolling with the company. In actuality, a Consultant's business is not his or her business at all, but instead an asset that Vantel can take away with impunity for its own pecuniary benefit whenever it pleases. That Vantel can do this is entirely inconsistent to what is constantly represented by the company to its Consultants.

22. Nor do Consultants actually have the opportunity to receive "unlimited" income or "financial

independence" after opting to pursue a "career" path by building his or her Vantel business. To the contrary, once a Consultant works hard to achieve a high rank with the corresponding income level, Vantel arbitrarily terminates that Consultant, thereby confiscating all of the residual income for its own pecuniary benefit. In doing this, Vantel either relies on unconscionable terms embedded within the Distributor Agreement, or, in the alternative, will conjure pretextual reasons to justify the termination. All in all, Vantel sole purpose for carrying out this scheme is to line its own pockets while stripping its Consultants of their hard-earned, "unlimited" income.

23. Lastly, although Vantel's Consultants are supposed to be independent contractors operating their own independent business, Vantel exercises complete control over the Consultant, and if a Consultant does not do exactly what it demands, then Vantel will terminate the Consultant and confiscate all of the Consultant's assets – being the downline he or she built through his or her hard work and effort. Vantel does this by using vague and unenforceable provisions in the Distributor Agreement to manufacture violations in which to terminate the Consultant.

**Plaintiffs as Consultant**

24. Plaintiffs enrolled as Vantel Consultants in or around April 18, 2016. Plaintiffs never agreed to, nor did they sign the Consultant Agreement and the Policies & Procedures when they enrolled in 2016.

25. At the time of their enrollment, Plaintiffs relied on the MLM Promise represented by Vantel and Hartel. As stated above, the MLM Promise was a continuing representation that was constantly being touted to Plaintiffs in order for them to continue building their respective businesses.

26. Based upon the MLM Promise, Plaintiffs believed that after they built their downline organization to a certain level of success, they would be able to possess sufficient residual

income from their downline to allow them to enjoy a more leisurely lifestyle.

27. After joining Vantel, Plaintiffs worked tirelessly during the next several years and built up their downline organization. In fact, Plaintiffs achieved the rank of #1 and #2 organizational sales and earned the titles of "Pearl Director" and "Gold Leader." Plaintiffs were earning approximately $50,000 a month, collectively.

**The Pearl Fest Event**

28. In or around June 23, 2019, Vantel held a private event in Rhode Island for all Consultants to attend. The event was named, "Pearl Fest."

29. In order to attend Pearl Fest a Consultant would be required to encumber certain expenses such as cost for purchasing the event's ticket, cost of travel, and cost of lodging. Needless to say, the event mandated significant time, expense, and dedication on part of a Consultant who opted to participate.

30. There is no mandate that a Consultant participate at Vantel events since Consultants are characterized as independent contractors. The decision to attend Vantel events rests solely at the discretion of the Consultant and no one else. This coincides with Vantel's representation that its Consultants operate their "own business" at their own pleasure. However, as explained below, this is not what Vantel practices.

**Plaintiffs' Termination**

31. Although Plaintiffs expected to attend the Pearl Fest event, they were unable to do so due to personal matters that suddenly arose. For this reason, Plaintiffs notified Vantel that they could not be present at Pearl Fest due to these matters.

32. After being notified of this, Vantel emailed Plaintiffs stating that if Plaintiffs did not attend the event, that they would jeopardize their "future" with the company. After having received this threat, Plaintiff did all they could to attend, but still could not make it due to their

conflicts.

33. Then, on June 28, 2019 (only 5 days after the event), Plaintiffs received a termination letter from Vantel stating that their respective distributorship positions have been terminated pursuant to Section 17 of the Consultant Agreement. There were no other reasons given for the termination.

34. As mentioned above, Section 17 of the Consultant Agreement states that a Consultant can be terminated for any or no reason. However, Section 17 of the Consultant Agreement conflicts with Section 62 of the Vantel Policies & Procedures, which states that a Vantel Consultant may only be terminated in the event of a violation of the Distributor Agreement. In addition, Section 17 of the Consultant Agreement contradicts the MLM Promise that has been touted to Plaintiffs to induce them to continue building their respective businesses. For these reasons, Plaintiffs believed their terminations were totally unjustified.

35. It was clear to Plaintiffs that their terminations had nothing to do with Vantel's purported right to terminate, but everything to do with its displeasure with Plaintiffs for failing to appear at Pearl Fest. In other words, Vantel terminated Plaintiffs solely as a means of retaliation for not adhering to its demands, even though it is represented to Plaintiffs that they are independent contractors and have no duty to attend corporate events.

36. In addition, Plaintiffs believe Vantel's decision to terminate their positions was so it could avoid paying residual commissions to Plaintiffs and confiscate their businesses for its own pecuniary benefit.

37. Either way, the terminations were wrongful and unjustified.

38. Accordingly, on July 15, 2019, Plaintiffs sent a letter to Vantel explaining why their terminations were wrongful. It was not until July 23, 2019 that Vantel responded with their own letter. In their July 23rd letter, Vantel mentioned, for the first time, that it terminated

Plaintiffs for violating the non-solicitation provision embedded within its Policies & Procedures. This allegation (which is entirely untrue in and of itself) was never stated anywhere in Plaintiffs' June 28th termination letters and appeared to have been included, as an after-thought, to justify Plaintiffs' termination. On information and belief, Vantel knew that Plaintiffs' terminations were unjustified. It therefore "fished out" whatever information it could after Plaintiffs' July 15th letter to manufacture a pretextual reason for the terminations. This constitutes fraud and bad faith on behalf of Vantel.

## COUNT 1

## DECLARATORY JUDGMENT – SECTION 17 OF THE CONSULTANT AGREEMENT

### (By Plaintiffs Against Vantel)

39. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth here.

40. According to Section 17 of the Consultant Agreement, Vantel contends that it has a right to terminate Plaintiffs' distributorship positions for any or no reason.

41. Plaintiffs contend Section 17 of the Consultant Agreement is unenforceable for the following reasons:

    a. Section 17 is unconscionable under Massachusetts law; and
    b. Section 17 is unenforceable as being illusory;

42. Plaintiffs also contend that Vantel is equitably estopped from relying on Section 17.

43. Thus, there exists a dispute as to the enforceability of Section 17 of the Consultant Agreement.

44. Plaintiff seeks an Order from this Court that Section 17 is not enforceable as against these Plaintiffs.

## COUNT 2

## DECLARATORY JUDGMENT – NON-SOLICITATION

**(By Plaintiffs against Vantel)**

45. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth here.

46. According to Section 11 of the Consultant Agreement, a Consultant may not solicit another Vantel Consultant to "cease doing business with the Company or otherwise alter their or its relationship with the Company."

47. Vantel contends that its non-solicitation provision is enforceable.

48. Plaintiffs contend that the non-solicitation is not enforceable under Massachusetts law.

49. Thus, a dispute exists as to the enforceability of the non-solicitation provision.

50. Plaintiffs seeks an order from this Court that Section 11 is not enforceable as against these Plaintiffs.

## COUNT 3

## BREACH OF GOOD FAITH AND FAIR DEALING

**(By Plaintiffs against Vantel)**

51. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth here.

52. Plaintiffs and Vantel entered into a contract wherein Plaintiffs would promote and distribute Vantel's products in exchange to receive commissions pursuant to Vantel's Compensation Plan.

53. The contract entails an implied obligation to act if good faith and fair dealing.

54. Vantel breached the implied covenant of good faith and fair dealing by, among other things:

   a. Terminating Plaintiffs' distributorship positions solely to avoid paying commissions that were otherwise vested to Plaintiffs;

   b. Terminating Plaintiffs distributorship positions as a means of retaliation for Plaintiffs failing to comply with its demands to appear at Pearl Fest; and

   c. Terminating Plaintiffs distributorship positions by using false, pre-textual reasons for

the termination, such as the false allegation that Plaintiffs violated Vantel's non-solicitation provision.

55. Plaintiffs have fully performed under the contract.

56. Vantel was never excused from performing under the contract.

57. As a result of Vantel's breach, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT 4

## BREACH OF WRITTEN CONTRACT

### (By Plaintiffs against Vantel)

58. Plaintiffs incorporate all preceding paragraphs as though fully set forth here.

59. Although Plaintiffs contend that they never entered into a written agreement with Vantel, they plead this claim in the alternative

60. Plaintiffs and Vantel had a written agreement identified as the Distributor Agreement, which granted Plaintiffs the opportunity to build a business and earn commissions based upon their sales, and the sales of others, of Vantel Products.

61. According to the Distributor Agreement, specifically Section 62 of the Policies & Procedures, Plaintiffs may only be terminated in the event of a violation of the Distributor Agreement. As mentioned above, Section 17 of the Consultant Agreement is unenforceable and therefore not applicable.

62. Plaintiffs have performed all obligations requirement of them under the terms of the Distributor Agreement.

63. Vantel has never been excused from performing its obligations under the Distributor Agreement.

64. Vantel breached the Distributor Agreement by terminating Plaintiffs without any cause or

violation of the agreement.

65. As a result of Vantel's breach, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT 5

### BREACH OF ORAL CONTRACT

### (By Plaintiffs Against Vantel)

66. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth here.

67. Plaintiff entered into an oral agreement with Vantel. According to the terms of the oral agreement, Plaintiffs were promised an opportunity to have "their own business" and earn "unlimited" income if they opted to pursue a "career' path with Vantel by building their downline organization. Plaintiffs were also offered to earn commission based upon their sales of Vantel products, and the sales of others within their downline organization. Lastly, pursuant to the foregoing representations, Plaintiffs believed the oral contract to include a term that Plaintiffs could only be terminated for cause.

68. Plaintiffs agreed to the terms of the oral agreement and continued to build their downline organization to a point of financial success.

69. Vantel was never excused from performing its obligations under the agreement.

70. Vantel breached the oral agreement by arbitrarily terminating Plaintiffs and confiscating their respective businesses for its own pecuniary benefit.

71. As a result of Vantel's breach, Plaintiffs have been damaged in an amount to be proven at trial.

## COUNT 6

### FRAUD – INTENTIONAL MISREPRESENTATION

### (By Plaintiffs against all Defendants)

72. Plaintiffs incorporate all preceding paragraphs as though fully set forth here.

73. In or around April 2016 and throughout the course of Plaintiffs' distributorship, Vantel made representations identified as the MLM Promise. This representation was made via Vantel's website, its marketing materials, its marketing tools, at live events, and even in Vantel's Policies & Procedures.

74. This was a promise that if Plaintiffs enrolled with the company and worked hard to build their downline organizations, then they would be afforded an opportunity to earn "unlimited" income in the form a residual commission. By doing this, Plaintiffs would eventually be able to step aside and live a more carefree lifestyle from their residual commissions.

75. In addition, Defendants represented that Plaintiffs' distributorship positions was their "own business" that they could operate to at their own convenience. Defendants representations made it appear as if Plaintiffs' business was an asset that they can sell, transfer, or even will.

76. The representations referenced above were false. For example, despite what Vantel represents, Consultants are not really given an opportunity to "start [their] own business" when enrolling with the company. In actuality, a Consultant's business is not his or her business at all, but instead an asset that Vantel can take away with impunity for its own pecuniary benefit whenever it pleases. That Vantel can do this is entirely inconsistent to what is constantly represented by the company to its Consultants.

77. Nor do Consultants actually have the opportunity to receive "unlimited" income or "financial independence" after opting to pursue a "career" path by building his or her Vantel business. To the contrary, once a Consultant works hard to achieve a high rank with the corresponding income level, Vantel arbitrarily terminates that Consultant, thereby confiscating all of the residual income for its own pecuniary benefit. In doing this, Vantel either relies on unconscionable terms embedded within the Distributor Agreement, or, in the alternative, will

conjure pretextual reasons to justify the termination. All in all, Vantel sole purpose for carrying out this scheme is to line its own pockets while stripping its Consultants of their hard-earned, "unlimited" income.

78. Lastly, although Vantel's Consultants are supposed to be independent contractors operating their own independent business, Vantel exercises complete control over the Consultant, and if a Consultant does not do exactly what it demands, then Vantel will terminate the Consultant and confiscate all of the Consultant's assets – being the downline he or she built through his or her hard work and effort. Vantel does this by using vague and unenforceable provisions in the Distributor Agreement to manufacture violations in which to terminate the Consultant.

79. Plaintiffs justifiably relied on Defendants' misrepresentation by spending years to build their respective business to a point of financial success. Indeed, as stated above, Plaintiffs had achieved the prestigious ranks of "Pearl Director" and "Gold Leader" and were earning approximately $50,000 a month, collectively. However, despite having devoted all these efforts to reach their goal of "unlimited" income, Defendants arbitrarily terminated Plaintiffs and confiscated all their income for their own benefit.

80. Defendants always knew that their representations were false; yet, kept this information hidden from Plaintiffs. Thus, Defendants malicious actions were intentional and meant to harm Plaintiffs.

81. As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

82. Defendants' actions as described above were made under circumstances constituting oppression, malice, fraud, and represent a conscious disregard for the rights of Plaintiffs while lining their own pockets. Plaintiffs are therefore entitled to punitive and exemplary damages in an amount to be decided according to proof.

## COUNT 7

## FRAUD – NEGLIGENT MISREPRESENTATION

### (By Plaintiffs against all Defendants)

83. Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth here.

84. Defendants made representations identified as the MLM Promise, which are identified above.

85. Defendants had a legal duty to supply correct information to Plaintiffs because it had entered into a contractual relationship with Plaintiffs.

86. Defendants representations were false.

87. Defendants had no reasonable basis for making those representations.

88. Plaintiffs justifiably relied on those representations.

89. As a result of Defendants' representation, Plaintiffs have been damaged in an amount to be proven at trial.

**WHEREFORE, PLAINTIFFS PRAY AS FOLLOWS:**

1. For compensatory damages in an amount to be proven at trial.
2. For an award of exemplary and punitive damages;
3. For costs and attorney's fees;
4. For an Order that Section 17 of the Consultant Agreement is unenforceable;
5. For an Order that Section 11 of the Consultant Agreement is unenforceable.
6. For such other and further relief as the Court deems just and proper.
7. A request for a jury trial of all issues.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,
Plaintiffs,
**ASHLEY GERTZ and ALICIA SKARBEK**,
By their Attorneys,

*/s/ Travis J. Jacobs*
Travis J. Jacobs, Esq. (BBO #671921)
Amie DiGiampaolo, Esq. (BBO #662558)
THE JACOBS LAW, LLC
36 Bromfield Street, Suite 502
Boston, MA 02108
T: (800) 652-4783
tjacobs@thejacobslaw.com
amied@thejacobslaw.com

DATED: September 27, 2019