# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| **ASHLEY GERTZ and ALICIA SKARBEK,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **19-12036-FDS** |
| | ) | |
| **VANTEL INTERNATIONAL/PEARLS IN THE OYSTER INC. d/b/a VANTEL PEARLS; JOAN A. HARTEL; and DOES 1 to 10,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

## MEMORANDUM AND ORDER
## ON DEFENDANTS' MOTION TO DISMISS

**SAYLOR, C.J.**

This is an action arising out of a contract termination.  In 2016, plaintiffs Ashley Gertz and Alicia Skarbek began selling products as distributors for defendant Vantel International/Pearls in the Oyster Inc., d/b/a Vantel Pearls, which is owned by defendant Joan Hartel.  In late 2019, Vantel Pearls terminated its relationship with plaintiffs.

The present dispute arises out of that termination.  The parties executed a contract in 2017, called a "Leader Agreement," that allows for at-will termination by either party.  Plaintiffs dispute the validity of that provision, and seek damages under a variety of theories for breach of contract and fraud.  Defendants have moved to dismiss all counts for failure to state a claim.

For the reasons set forth below, the motion to dismiss will be granted in part and denied in part.

# I.     Background

## A.     Factual Background

The following facts are presented as alleged in the complaint unless otherwise noted.

Ashley Gertz and Alicia Skarbek are residents of Maryland and Florida, respectively. (Amended Compl. ¶¶ 1-2).

Vantel International/Pearls in the Oyster Inc., doing business as Vantel Pearls, is a Massachusetts corporation with a principal place of business in Massachusetts.  (*Id.* ¶ 3).  Vantel is a "multi-level marketing company" ("MLM") that manufactures and distributes jewelry.  (*Id.* ¶ 9).  Joan A. Hartel, a Massachusetts resident, is the owner and chief executive officer of Vantel Pearls.  (*Id.* ¶¶ 4, 19).

Vantel sells its products through a network of independent distributors, which it calls "Consultants."  (*Id.* ¶ 10).  Consultants are paid according to a compensation plan that pays them according to, among other things, their sales volume and the sales attributable to Consultants they recruit to the organization.  (*See id.* ¶ 10-11).  Consultants who recruit a large network of Consultants can earn significant income through little or no work, relying on their downstream network to sell products for which they would, in part, be compensated.  (*Id.*).

Plaintiffs allege that this business model was presented to them by Vantel and Hartel through a series of false representations.  Those representations came in the form of marketing materials, training tools, live events, phone conferences, and official policies and procedures. (*Id.* ¶ 19).  According to the complaint, the substance of the representations was that Consultants could build a business on their own terms that would provide them with an opportunity for "unlimited" income and continued success.  (*Id.* ¶¶ 19-21).  Furthermore, once the work had been done to create a downstream network, Consultants could earn money with little work as

they reaped the profits of their business.  (*See id.*).  Plaintiffs allege that these representations collectively constituted an "MLM Promise" that attracted them to the company.  (*Id.* ¶ 27)

Plaintiffs became Consultants with Vantel on April 18, 2016.  (*Id.* ¶ 26).  They allege that they did not sign any contract or otherwise agree to the company's policies and procedures at the time.  (*Id.* ¶ 27).  Instead, they contend that they "solely relied" on the representations made by Vantel and Hartel.  (*Id.*).[1]

The relationship proved very fruitful.  After joining in April 2016, plaintiffs became the two highest ranked Consultants in the Vantel organization, attaining titles of "Pearl Director" and "Gold Leader."  (*Id.* ¶ 30).  Plaintiffs were collectively earning approximately $50,000 a month under the compensation plan.  (*Id.*).

In November 2017, Vantel presented plaintiffs with a new contract, which it called the "Leader Agreement."  (*Id.* ¶¶ 31-32; *see also* Def. Mem. in Supp. Ex. 3).[2]  The plaintiffs apparently executed identical contracts with Vantel.  (*See* Amended Compl. ¶¶ 31-37).  This contract was allegedly offered on a "take-it-or-leave-it" basis, and plaintiffs could not retain their businesses if they did not sign the agreement as it was presented.  (*Id.* ¶¶ 31-32).  Both plaintiffs signed the Leader Agreement, but allege that they had no choice in the matter.  (*Id.* ¶ 37).  In 2019, the 2017 Leader Agreement was supplanted by a 2019 Leader Agreement, but any differences between the two agreements appear to be immaterial at this stage.  (*Compare* Def.

---

[1] Defendants contest this fact.  They contend that plaintiffs signed a contract called the "Demonstrator Agreement" at the onset of the parties' relationship.  (*See* Def. Mem. at 4-5; *id.* Ex. D).  At the motion to dismiss stage, however, the court must assume the truth of the facts properly pleaded in the complaint.  *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007).

[2] The complaint refers to this contract as both the "Distributor Agreement" and "Consultant Agreement," but the contract in question, which is attached to defendants' motion to dismiss, is entitled the "Leader Agreement." (*Compare* Amended Compl. ¶ 17 *with* Def. Mem. in Supp. Ex. 3).  Plaintiffs do not dispute defendants' nomenclature in their briefing, and for clarity it will be referred to as the "Leader Agreement."

Mem. in Supp. Ex. 3 *with id.* Ex. 5).[3]

Several sections of the Leader Agreement are of particular relevance to plaintiffs' claims. First, Section 15 contains a termination clause, under which either party may terminate the agreement with or without cause. (*Id.* ¶ 33; Def. Mem. in Supp. Ex. 3, 5-6).[4]   Second, Section 8 contains a non-competition clause, which also includes a non-solicitation provision. (Def. Mem. in Supp. Ex. 3 at 3-4). [5]   Finally, Section 28 contains an integration clause, which states that the Leader Agreement "constitutes the sole and complete agreement between the parties . . . and supersedes any prior agreement on [relevant] subject matter.  No modification may be made except in writing executed by both parties." (*Id.* at 8).

Plaintiffs allege that the Leader Agreement conflicts with various other communications between the parties.  Specifically, they allege that the Policies and Procedures of Vantel state that the company could terminate a Consultant's business for violations of the Leader Agreement, which suggests that termination could only be for cause.  (Amended Compl. ¶ 35).  Furthermore, they contend that the representations made as part of the MLM Promise implied that defendants could not terminate their relationship with plaintiffs at will.  (*Id.* ¶ 34).

On June 23, 2019, Vantel held an event for Consultants called "Pearl Fest."  (*Id.* ¶ 38). Plaintiffs allege that there was no requirement that a Consultant attend Pearl Fest.  (*Id.* ¶ 40).[6]

---

[3] In reviewing a complaint under Rule 12(b)(6), the court "may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment." *Clorox Co. Puerto Rico v. Procter & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir.1996)). Accordingly, both the 2017 and 2019 Leader Agreements attached to defendants' motion may be considered by the Court.

[4] The complaint identifies the termination clause as § 14.  (*See, e.g.,* Amended Compl. ¶ 17).  However, the termination clause of the Leader Agreement is contained in § 15.  (*See* Def. Mem. in Supp. Ex. 3, § 15).

[5] There is also a stand-alone "Non-Solicitation" clause, (*see* Def. Mem. in Supp. Ex. 3, § 9) but Count 2, as discussed below, does not refer to that section.

[6] The complaint does not clarify whether attendance was not required because Vantel did not intend to require it, or whether Vantel tried to require it, but could not do so because Consultants are independent contractors.

For unspecified reasons, plaintiffs were unable to attend the event.  (*Id.* ¶ 41).  Upon learning of their non-attendance, Vantel warned them that failure to attend could "jeopardize their 'future' with the company."  (*Id.* ¶ 42).

Five days later, on June 28, 2019, plaintiffs received letters from Vantel stating that their positions had been terminated pursuant to § 15 of the Leader Agreement.  (*Id.* ¶ 43).  Plaintiffs allege that they were terminated in response to their failure to attend Pearl Fest and in order to avoid paying them the residual commissions they were due.  (*Id.* ¶¶ 45-46).

On July 23, 2019, Vantel sent plaintiffs a second letter stating that they were terminated for violating the non-solicitation provisions within the company's Policies and Procedures.  (*Id.* ¶ 48).  Plaintiffs allege that this justification is pretextual.  (*Id.*).

### B.    Procedural Background

The amended complaint asserts seven claims:  a declaratory judgment that the termination clause of the Leader Agreement is unconscionable (Count 1); a declaratory judgment that the non-solicitation provision of the Leader Agreement is unenforceable (Count 2); breach of the covenant of good faith and fair dealing (Count 3); breach of written contract (Count 4); breach of oral contract (Count 5); intentional misrepresentation (Count 6); and negligent misrepresentation (Count 7).

Defendants have moved to dismiss all counts pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## II.    Legal Standard

On a motion to dismiss pursuant to Rule 12(b)(6), the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*,

175 F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, the complaint must state a

claim that is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In

other words, the "[f]actual allegations must be enough to raise a right to relief above the

speculative level, . . . on the assumption that all the allegations in the complaint are true (even if

doubtful in fact)."  *Id.* at 555 (citations omitted).  "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or

inferential, respecting each material element necessary to sustain recovery under some actionable

legal theory."  *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Médico*

*del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

Under Fed. R. Civ. P. 9(b), a complaint alleging fraud must "state with particularity the

circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  To satisfy the requirements of Rule

9(b), plaintiffs must specifically plead "the time, place and content of an alleged false

representation."  *U.S. ex rel. Heineman-Guta v. Guidant Corp.*, 718 F.3d 28, 34 (1st Cir. 2013);

*accord Rodi v. Southern N.E. Sch. of Law*, 389 F.3d 5, 15 (1st Cir. 2004) (stating that Rule 9(b)

is satisfied by averment of "the who, what, where, and when of the allegedly false or fraudulent

representation").  However, "the specificity requirement extends only to the particulars of the

allegedly misleading statement itself . . . .  The other elements of fraud, such as intent and

knowledge, may be averred in general terms."  *Rodi*, 389 F.3d at 15.

## III.  <u>Analysis</u>

For the reasons below, the motion to dismiss will be granted as to Counts 1, 4, 5, 6, and

7, and denied as to Counts 2 and 3.

A.      <u>**Count 1—Declaratory Judgment on Termination Clause**</u>

Count 1 seeks a declaratory judgment that the termination clause of the Leader

Agreement is unconscionable.  The termination clause states as follows:

> The Company or Leader may, with or without cause, terminate this Agreement at
> any time upon written notice, including e-mail, to the other party.  . . .  If the
> Company or Leader elects to terminate this Agreement for any reason, Leader
> understands that Leader will permanently lose all rights as a Leader.  Leader shall
> not be eligible to sell Vantel Pearls products, nor shall Leader be eligible to
> receive commissions, bonuses, incentives, or other income resulting from the
> activities of Leader's former downline organization.  In the event of cancellation,
> termination, breach or violation of this Agreement, Leader understands and
> waives all rights Leader has, including but not limited to, any bonuses,
> commissions, incentives, or other remuneration derived through the sales and
> other activities of Leader's former downline organization, whether or not the sales
> for such bonuses or commissions have been completed.

(Def. Mem. in Supp. Ex. 3, § 15; *id.* Ex. 5, § 15).[7]

Whether a contract term is unconscionable is to be considered "in the light of its setting,

purpose, and effect." *Miller v. Cotter*, 448 Mass. 671, 679 (2007) (quoting Restatement

(Second) of Contracts § 208, comment a (1981)).  "Under Massachusetts law, to prove that the

terms of a contract are unconscionable, a plaintiff must show both substantive unconscionability

(that the terms are oppressive to one party) and procedural unconscionability (that the

circumstances surrounding the formation of the contract show that the aggrieved party had no

meaningful choice and was subject to unfair surprise)."  *Machado v. System4 LLC*, 471 Mass.

204, 218 (2015) (quotations omitted).  Unconscionability is assessed as of the time the contract

was made, not at the time the disagreement arises.  *Nasco, Inc. v. Public Storage Inc.*, WL

337072, *4 (D. Mass. May 20, 1995).  The burden lies with the party contending that a contract

---

[7] As noted, the Leader Agreement was revised in 2019, but the termination clause is identical in both
versions.  (*Compare* Def. Mem. in Supp. Ex. 3 *with* Def. Mem. in Supp. Ex. 5).  The complaint does not mention
this fact, but the unconscionability argument focuses exclusively on the context of the 2017 Leader Agreement.
Furthermore, plaintiffs' subsequent filings have clarified that it is the 2017 Leader Agreement that they contend is
unconscionable.

is unconscionable.  *See, e.g., Bekele v. Lyft*, 199 F. Supp. 3d 284, 293 (D. Mass. 2016).

### 1.     Procedural Unconscionability

The doctrine of procedural unconscionability considers the context of a contract's formation.  A contract may be procedurally unconscionable if the process leading up to its formation is oppressive—that is, if the "circumstances surrounding the formation of the contract show that the aggrieved party had no meaningful choice."  *Storie v. Household Int'l, Inc.,* 2005 WL 3728718, at *9 (D. Mass. Sept. 22, 2005) (quoting *Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 293–94 (1980)).  Examples of oppressive formation processes include ultra-high-pressure sales tactics or alterations to an existing contract where the "content, the obscurity, and the timing of the [communication] and [ ] failure to require a response [] raise unconscionability concerns."  *See Waters v. Min Ltd.*, 412 Mass. 64, 68 (1992); *Skirchak v. Dynamics Research Corp.*, 508 F.3d 49, 60 (1st Cir. 2007).

The fact that a contract is an adhesion contract is not, standing alone, "reason to deny [its] enforcement."  *Minassian v. Ogden Suffolk Downs, Inc.*, 400 Mass. 490, 492 (1987).  That is especially true in the business context, where "there is far less reason to designate [a take-it-or-leave-it] contract as unconscionable than in the typical consumer transaction."  *Id.*  "[A[bsent fraud, a party's failure to read or understand a contract provision does not free him [or her] from its obligations."  *Miller*, 448 Mass. at 680.

Here, the contract was clearly presented and executed in a business context.   The complaint repeatedly characterizes plaintiffs as business owners operating in a business environment.  (*See, e.g.,* Amended Compl. ¶ 13 (". . . it acts as the marketing arm for a Consultant's business."); *id.* ¶ 37 (" . . . thereby losing their entire business . . . ."); *id.* ¶ 70 ("Plaintiffs were also promised an opportunity to own and build a business . . . .")).

Furthermore, it does not allege that plaintiffs did not have a full opportunity to read the contract or consult with counsel. (*See id.* ¶¶ 30-37).

Nonetheless, plaintiffs contend that the circumstances under which the contract was created were procedurally unconscionable for two reasons. First, they contend that "it was forced upon [them] with the threat that they would lose their already-built businesses unless they agreed to the provision." (Amended Compl. ¶ 54). Second, they claim that the termination provision "was intentionally hidden from [them]." (*Id.*). The first contention may be readily dismissed. At the point the contract was allegedly forced upon them, the parties' relationship was terminable at will. Subject to certain narrowly defined limitations—for example, depriving plaintiffs of compensation already earned—Vantel was free to terminate the relationship, or to insist that it continue only under certain circumstances. Again, in the business context, a take-it-or-leave-it offer is normally permissible, and there is no requirement that any resulting contract must be found procedurally unconscionable. *See Minassian*, 400 Mass. at 492. The term "threat," as used in the complaint, is only a conclusory label and does not render the contracting process described otherwise wrongful. *See also McInnes v. LPL Fin., LLC*, 466 Mass. 256, 266 (2013) ("Contracts of adhesion are enforceable *unless* they are unconscionable, offend public policy, or are shown to be unfair in the particular circumstances.") (emphasis added) (quoting *Miller*, 448 Mass. at 684 n.16).

Plaintiffs' second contention is that the "MLM Promise" and Vantel's Policies and Procedures somehow served to hide the existence of the termination clause. But the Leader Agreement contains a clause stating that the signee has carefully read and understood the agreement. (Def. Mem. in Supp. Ex 3, § 27). Again, the complaint makes no allegation that plaintiffs were denied an opportunity to read and consider it before they signed it. Furthermore,

the termination clause is written in plain English as a part of a short, nine-page contract.  *See also*

*Zapatha*, 381 Mass. at 293-94 (finding take-it-or-leave-it contracting process conscionable

because termination clause was not "obscurely worded" and plaintiff had time to read and

consider contract).  The termination clause was therefore not "hidden" from plaintiffs, and the

circumstances under which it was agreed to are not procedurally unconscionable.

### 2.    Substantive Unconscionability

The issue of substantive unconscionability concerns whether a contract term is overly

oppressive to one side.  *See Machado*, 471 Mass. at 218.  Massachusetts courts have consistently

found contract terms conscionable in the business context where, as here, the contract allows for

at-will termination despite significant investment by one party.  For example, in *Paquet v. Life

Technologies Corporation*, 95 Mass. App. Ct. 1113, *2–3 (2019) (unpublished), the court did not

find a contract unconscionable when defendant declined to exercise a purchase option, denying

plaintiff a $1 million payout despite significant investment.  The court observed "that Paquet

took a considerable risk . . . , [but] he was not forced to do so . . . .  It was his choice to accept the

[] terms and to participate accordingly."  *Id.* at *3.

Here, plaintiffs were compensated on a monthly basis in accordance with the

Compensation Plan.  Unlike the contract in *Paquet*, the Leader Agreement did not allow

defendants to avoid compensating plaintiffs entirely; it mandated periodic payments on an

ongoing basis up until either side exercised its termination right.  As in *Paquet*, the mere fact that

one side could terminate the contract and leave the other bearing certain investment expenses is

not enough to find substantive unconscionability—both parties knowingly entered the contract

despite that risk.  *See also Zapatha*, 381 Mass. at 295 ("To find the termination clause oppressive

merely because it did not require cause for termination would be to establish an unwarranted

barrier to the use of termination at will clauses in contracts in this Commonwealth, where each party received the anticipated and bargained for consideration during the full term of the agreement.").

Plaintiffs further contend that the termination clause is substantively unconscionable because it contradicts the "MLM Promise" and because it "contradicts MLM industry-wide standards." (Amended Compl. ¶ 53).  Neither argument is persuasive.  The fact that this term may run counter to the "MLM Promise" is irrelevant, as discussed below, because the terms of the integrated contract control.  And plaintiffs cite no authority for the proposition that a contract is substantively unconscionable merely for deviating from industry standards.

Accordingly, the contract is neither procedurally nor substantively unconscionable, and therefore Count 1 will be dismissed for failure to state a claim.

**B.      Count 2—Declaratory Judgment on Non-Solicitation Clause**

Count 2 seeks a declaratory judgment that the non-solicitation clause within the non-competition provision of the Leader Agreement is unenforceable.[8]  The relevant clause states as follows:

> Leader agrees that Leader will not, directly or indirectly, for him/herself or any other person or business entity within the Limitation Area (defined below): . . . (ii) Solicit or accept business from, or contact in any way any of Company's independent contractor consultants, customers, or prospects ("prospect" defined as any entity or individual Leader had business dealings with during the Non-Competition Term) . . . .

(Def. Mem. in Supp. Ex. 3, § 8(ii)).  That provision applies for a period of one year following the

---

[8] Count 2 simply refers to the "non-solicitation provision."  (*See* Amended Compl. ¶ 60-61).  Defendants' motion, understandably in the Court's view, addressed the non-solicitation section of the Leader Agreement.  (*See* Def. Mem. in Supp. Ex. 3, § 9).  During briefing of this motion, however, it became clear that Count 2, in fact, addressed a non-solicitation clause within the non-competition provision.  (*See id.* § 8(ii)).  In light of this confusion, defendants excusably briefed this issue primarily in their reply brief.  The Court gives these arguments full consideration.

termination of the Leader Agreement and covers the state in which the Leader did business with

Vantel Pearls. (*Id.* § 8(b)). Plaintiffs contend that this clause is unenforceable for four reasons:

(1) "it was forced upon [them] after they enrolled," (2) "there was no mention of this provision,

nor was there any opportunity to negotiate its term," (3) Vantel did not provide consideration,

and (4) as interpreted by Vantel it constitutes an unreasonable restraint of trade. (Amended

Compl. ¶¶ 62-65).

The first two arguments may be quickly dismissed. Both contentions are, in substance,

arguments that the contract was procedurally and substantively unconscionable, which are not

viable claims for the reasons set forth above.

The contention that Vantel did not provide consideration is also without merit. The

complaint does not suggest that the non-solicitation clause lacks consideration. To the contrary,

it states that plaintiffs earned approximately $50,000 *a month* under the Leader Agreement and

the associated Compensation Plan. (Amended Compl. ¶ 30). Plaintiffs do not explain, in their

pleadings or briefing, why those earnings do not constitute consideration. Compensation earned

pursuant to the Leader Agreement surely provided the necessary consideration for the terms of

the contract. *See generally* WILLISTON ON CONTRACTS § 7:21, "Adequacy of Consideration"

(4th ed. 2019) ("It is an elementary and oft quoted principle that the law will not inquire into the

adequacy of consideration as long as the consideration is otherwise valid or sufficient to support

a promise.").

The clause permitting termination at will does not affect that conclusion. Whether the

Leader Agreement is considered a commercial or employment contract, under Massachusetts law

consideration exists despite mutual termination rights when both parties perform under the

contract. *See Simons v. Am. Dry Ginger Ale. Co.*, 335 Mass. 521, 525 ("Even if the contract is

construed as terminable at will . . . that does not necessarily make the contract illusory . . . ."); *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 10 (1st Cir. 2003) (holding that under Massachusetts law, if parties agree to modify at-will employment contract, continued employment by employer and work by employee "can satisfy the consideration requirement"). *See also PartyLite Gifts, Inc. v. MacMillon*, 895 F. Supp. 2d 1213, 1222–24 (M.D. Fla. 2012) (finding consideration present under Massachusetts law in similar circumstance of Leader Agreement in direct-to-consumer consultant contract).

The enforceability of the clause thus depends on whether it constitutes an unreasonable restraint of trade.  A non-solicitation provision, like a non-competition provision generally, is enforceable if it is necessary to protect a legitimate business interest, reasonably limited in time and space, and consistent with the public interest.  *See 178 Lowell Street Operating Co., LLC v. Nichols*, 152 F. Supp. 3d 47, 54 (D. Mass. 2016) (citations omitted).

Plaintiffs allege that the non-solicitation provision is unreasonably broad in scope, and thus does not protect a legitimate business interest, for three reasons:  (1) "it restricts solicitation of Consultants and Customers into businesses that do not even compete with Vantel's products," (2) "the provision restricts Consultants from even contacting and/or accepting business from other Consultants or Customers. . . . forc[ing] Consultants and Customers to stay with Vantel . . . , and (3) Vantel has interpreted "a solicitation as merely placing a public post on Facebook, which is unreasonable under Massachusetts law."  (Amended Compl. ¶ 66).[9]

The non-solicitation provision may be unenforceable to the extent that it restricts

---

[9] The complaint does not take issue with the provision's temporal or geographic scope.  Those are defined as "one year following the termination of the Leader's agreement with the company" and "the state in which Leader performed services," respectively.  (Def. Mem. in Supp. Ex 3, § 8(a) & (b)).  Neither is obviously problematic under Massachusetts law.  *See, e.g., Genzyme Corp. v. Laidlaw*, 84 Mass. App. Ct. 1134, *2 (2014) (finding one-year, nationwide non-compete reasonable under Massachusetts law).

plaintiffs from accepting business that they did not solicit.  In *Corporate Technologies, Inc. v. Harnett*, 943 F. Supp. 2d 233, 238–39 (D. Mass. 2013), the court granted a preliminary injunction to prevent a former employee from violating his non-solicitation agreement. Although the court upheld the agreement, it noted that "[a] non-solicitation agreement does not prevent a company from receiving business initiated by the client with no direct or indirect participation by the individual employee bound by the non-solicitation agreement.  To hold otherwise would bind third parties to agreements they did not sign or agree to."  *Id.* at 239 (D. Mass. 2013) (citations omitted).

The non-solicitation provision here may run contrary to that proposition.  The contract states that a Leader may not "[s]olicit *or accept* business from . . . any of the Company's independent contractor consultants, customers, or prospects."  (Def. Mem. in Supp. Ex. 3, § 8(a)(ii)) (emphasis added).  That language runs directly afoul of the proposition stated in *Harnett*—it limits the freedom of non-contracting parties to approach plaintiffs.  Taking the allegations in the complaint as true, the complaint therefore alleges a plausible claim for unenforceability of the non-solicitation clause.

As noted, Count 2 also challenges the scope of the provision on the ground that it restricts Consultants in businesses that do not compete with Vantel.  (Amended Compl. ¶¶ 65–66).  To be sure, those allegations support plaintiffs' argument that this provision is unenforceable—a non-solicitation provision is only enforceable to the extent that it protects a legitimate business interest.  *See, e.g., 178 Lowell Street*, 152 F. Supp. 3d at 54.  However, those allegations are quite threadbare, and because Count 2 will survive for other reasons, the Court sees no reason to separately consider these allegations here.

Accordingly, defendants' motion to dismiss on Count 2 will be denied.

14

### C.   Count 3—Breach of Covenant of Good Faith and Fair Dealing

Plaintiffs next allege that Vantel breached the implied covenant of good faith and fair dealing by wrongfully terminating them to avoid paying residual commissions.[10]

"The covenant of good faith and fair dealing is implied in every contract." *Uno Restaurants, Inc. v. Bos. Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004) (internal citations omitted).  But "[t]he covenant may not . . . be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Id.*

Exercising termination rights to avoid paying earned compensation may violate the implied covenant.  In *Fortune v. National Cash Register Co.*, 373 Mass. 96, 101 (1977), plaintiff was an at-will salesman who was demoted, and eventually terminated, prior to being paid bonuses to which he would have otherwise been entitled.  The SJC affirmed a jury verdict of bad-faith termination.  *Id.*  It held that even though the employee was at-will, the employer violated the implied covenant by abusively timing his termination to avoid paying him for work already performed.  *Id.* at 104–6.  *See also Gram v. Liberty Mutual Ins. Co.*, 384 Mass. 659, 659–72 (1981) (holding that termination without good cause may give rise to violation of covenant of good faith and fair dealing if done to deny employee "identifiable, reasonably

---

[10] Plaintiffs also allege that the implied covenant of good faith and fair dealing was breached because they were wrongfully terminated for not attending Pearl Fest and because Vantel terminated them for pretextual reasons. (Amended Compl. ¶ 72 (a), (b)).  However, because the termination clause is valid, neither of those allegations is sufficient to state a claim for violating the covenant.  To hold otherwise would modify the express, enforceable terms of the Leader Agreement.  *See, e.g., Cort v. Bristol-Myers Co.*, 385 Mass. 300, 305 (1982) ("We decline to impose liability on an employer simply because it gave a false reason or a pretext for the discharge of an employee at will. Such an employer has no duty to give any reason at the time of discharging an employee at will.").

anticipated future compensation, based on [the employee's] past services.").

But the principles of *National Cash Register* are not infinite.  A court must distinguish between compensation attributable to past work and that attributable to future work.  For example, in *Harrison v. NetCentric Corp.*, 433 Mass. 465, 470–76 (2001), the SJC considered a claim for a violation of the implied covenant when an employee was terminated prior to the full vesting of his stock.[11]  The court held that because "plaintiff's shares were to vest each quarter *that he remained a NetCentric employee* until they had fully vested," the unvested shares were not earned compensation for past services, but compensation contingent on his continued employment.  *Id.* at 473 (emphasis added).  The operative inquiry, then, is whether the complaint seeks future compensation for future work as in *Harrison*, or if, as in *National Cash Register* and *Gram*, it seeks future compensation for past services rendered.

Defendants contend that the Compensation Plan precludes plaintiffs' claim.  In their view, because Consultants earn money under the plan according to metrics measured each payment period, the Compensation Plan resembles that in *Harrison*.  Accordingly, they argue, plaintiffs' claim fails because, as a matter of contract, they are seeking compensation for future performance.  (Def. Mem. in Supp., 13).

But the courts in *National Cash Register* and *Gram* undertook functional, not formalistic, inquiries.  In both of those cases, the compensation at issue was future commissions that had not yet formally vested.  *National Cash Register*, 373 Mass. at 97 (applying doctrine to commissions for sales that occurred immediately following termination of salesman), *Gram*, 384 Mass. at 670 (applying doctrine to potential future renewal commissions from pre-existing customers).  In

---

[11] Although the SJC applied Delaware law to much of the case, the contract issue was analyzed under Massachusetts law.  *Harrison*, 433 Mass. at 472-73.

each case, however, the court found lack of cause for termination, identifiable future income attributable to past work, and allegations of bad faith on the part of the employers.

The complaint here alleges those elements.  It alleges that defendants terminated plaintiffs without cause; that plaintiffs performed past work to create an identifiable income stream for which they have not been fully compensated; and that defendants acted in bad faith. (Am. Compl. ¶ 13, 30, 72).  *See Gram*, 384 Mass. at 672 ("We think that the obligation of good faith and fair dealing imposed on an employer requires that the employer be liable for the loss of compensation that is so clearly related to an employee's past service, when the employee is discharged without good cause.").  Those facts, if proved, could support a claim for a violation of the implied covenant of good faith and fair dealing under Massachusetts law.  Accordingly, the motion to dismiss will be denied as to Count 3.

### D.  Count 4—Breach of Written Contract

Count 4 alleges a breach of written contract by Vantel and Hartel.  Plaintiffs contend that defendants breached the Leader Agreement by terminating them without identifying a violation of the agreement.  That argument is apparently animated by plaintiffs' belief that the termination clause of the Leader Agreement is unenforceable, and that the Vantel Policies and Procedures control.  Section 62 of the Policies and Procedures, which is incorporated into the Leader Agreement in § 4, states that

> [a]ny violation of Vantel Pearls Policies and Procedures Manual or the Independent Consultant Agreement or any illegal, fraudulent, deceptive, or unethical business conduct . . . may result, at [Vantel Pearls'] discretion, in suspension or termination . . . .

(*See* Def. Mem. in Supp., 15).[12]

---

[12] Unfortunately, neither party appears to have attached the Policy and Procedures document in full. Accordingly, the Court is forced to rely upon the excerpts from the document that the parties included in their briefing.

However, because the entire contract (including the termination clause) *is* enforceable, it empowers defendants to terminate plaintiffs without cause.  And to the extent, if any, that the termination clause can be read to conflict with § 62 of the Policies and Procedures, the termination clause controls.

"A contract must . . . be interpreted as a whole and effect must be given to all of its provisions in order to effectuate its overall purpose."  *Brillante v. R.W. Granger & Sons, Inc.,* 55 Mass. App. Ct. 542, 548 (2002) (internal quotation omitted).  Furthermore, "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or to no effect."  Restatement (Second) of Contracts § 203(a) (1981).  Applying those principles, § 62 of the Policies and Procedures and § 15 of the Leader Agreement may be readily harmonized.  The former provides a specific reason why Vantel may terminate a Consultant, and the latter reserves the right of either party to do so with or without cause.  There is no direct conflict between a contract provision that allows either party to terminate an agreement and a provision incorporating a corporate policy of exercising that right under a particular, but non-exclusive, circumstance.  Accordingly, defendants did not breach the contract by terminating plaintiffs without cause, and Count 4 will be dismissed.

###    E.    Count 5—Breach of Oral Contract

Count 5 alleges a breach of oral contract by defendants.  Plaintiffs contend that defendants, in touting the opportunity to run a flexible, profitable business with Vantel through the MLM Promise, entered into an oral contract with plaintiffs.  They contend that defendants breached that oral contract by terminating the Leader Agreement without cause.

Under the parol evidence rule, when two parties have a written, integrated contract, the

court may not consider evidence of prior or contemporaneous agreements to vary the terms of the written agreement. *See Brennan v. Carvel*, 929 F.2d 801, 806 (1st Cir. 1991); Restatement (Second) of Contract, § 213 (1981). Although extrinsic evidence may be admitted to resolve contract ambiguity, it may not be used to contradict the plain language of an integrated, written contract. *Sunoco, Inc. v. Makol*, 372 F.3d 31, 36 n.1 (1st Cir. 2004) (citing *Robert Indus., Inc. v. Spence*, 362 Mass. 751 (1973)).

Those well-established principles of law preclude the oral-contract claim. The Leader Agreement contains an integration clause. (*See* Def. Mem. in Supp. Ex. 3, § 28 ("This Agreement constitutes the sole and complete agreement between the parties with respect to the subject matter hereof and supersedes any prior agreement on such subject matter.")). Plaintiffs ask the Court to view the MLM Promise as a separate, oral, contradictory contract term despite the existence of a written, fully integrated contract—which is exactly what the parol evidence rule forbids. Accordingly, Count 5 will be dismissed.

## F.   Count 6 and 7—Intentional or Negligent Misrepresentation

Counts 6 and 7 assert claims of intentional and negligent misrepresentation, respectively. The thrust of both claims is that defendants, through intentional or negligent statements, made false representations in touting the MLM Promise. (Amended Compl. ¶ 91).[13] Those representations allegedly stated or implied that a Consultant's distributorship was one's own business that could be operated at her convenience. (*Id.* ¶ 93). Those representations, plaintiffs allege, were false, because Vantel retained the ability to take away a Consultant's business "with impunity . . . whenever it pleases." (*Id.* ¶ 94). Rather than presenting opportunities for unlimited

---

[13] In the case of Hartel, plaintiffs allege that all statements made through Vantel were authorized by Hartel and thus "carried out by Hartel herself." (Amended Compl. ¶ 91).

income and flexibility, Vantel "arbitrarily terminated [Consultants to] confiscat[e] all of the residual income for its own pecuniary benefit." (*Id.* ¶ 95-96). Plaintiffs claim to have justifiably relied on these misrepresentations by spending years building their businesses, only to be arbitrarily terminated. (*Id.* ¶ 97).

To prove a claim for misrepresentation under Massachusetts law, a plaintiff must show that the defendant "made a false representation of material fact; for the purpose of inducing reliance; and that the plaintiff relied upon the representation to his or her detriment." *Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 22 (1st Cir. 2001).[14] In addition, a plaintiff must show that his or her reliance on the alleged misrepresentations was reasonable. *See, e.g., Saxon Theatre Corp. of Boston v. Sage*, 347 Mass. 662, 666–67 (1964); *Hogan v. Riemer*, 35 Mass. App. Ct. 360, 365 (1993).

The allegations in the complaint fail to state a viable claim for misrepresentation. Under Massachusetts law, "reliance on supposed misrepresentations that contradict the terms of the parties' agreement is unreasonable as a matter of law." *HSBC Realty Credit Corp. (USA) v. O'Neil*, 745 F.3d 564, 574 (1st Cir. 2014). In *HSBC Realty*, defendant was the guarantor for a real estate loan. *Id.* at 570. When the lender attempted to enforce the guaranty, defendant brought various counterclaims, including several counts of fraud. *Id.* The First Circuit rejected the fraud claims on the ground that "the contract-inducing misrepresentations that O'Neill trumpet[ed] [we]re irreconcilably at odds with the guaranty's express terms." *Id.* at 571. Accordingly, his reliance on these misrepresentations was unjustified as a matter of law. *Id. See*

---

[14] The relevant difference between intentional misrepresentation claims and negligent misrepresentation claims is the "degree of culpability a plaintiff must prove to establish liability." *Cummings*, 244 F.3d at 24. However, because these counts will both be dismissed on the reliance prong, this difference is immaterial at this stage. *Cf. Cummings*, 244 F.3d at 22 ("[C]ourts sometimes analyze negligent misrepresentation claims and deceit claims together . . . .").

*also Turner v. Johnson & Johnson*, 809 F.2d 90, 95–98 (1st Cir. 1986) (holding that reliance on untrue statements that were "flatly" contradicted by contract term could not give rise to fraud action since any reliance could not be reasonable).

This same principle controls here.  The Leader Agreement unambiguously provides for termination at will by either party.  (Def. Mem. in Supp. Ex. 3, § 15).  In both misrepresentation claims, however, plaintiffs allegedly relied on broad statements, collectively referred to as the MLM Promise, implying that plaintiffs would own their business and would not be terminable at will.  (Amended Compl. ¶ 91).  But as a matter of law, plaintiffs' reliance on those statements is not justified—by signing an unambiguous contract to the contrary, plaintiffs agreed to the contractual language.  To hold otherwise would undermine the certainty afforded to parties in executing binding written contracts.  *See Turner*, 809 F.2d at 96 (1st Cir. 1986) ("[I]f a jury is allowed to ignore contract provisions directly at odds with oral representations allegedly made during negotiations, the language of a contract simply would not matter anymore. . . .  Contracts would become no more than presumptive statements of the parties' intentions, instead of legally enforceable agreements.").

Plaintiffs contend that the misrepresentation claims are nonetheless valid for several reasons.  First, they allege that the alleged fraud began in 2016, almost two years before the Leader Agreement was signed.  But the law does not permit reliance on such prior oral assertions.  *See Starr v. Fordham*, 420 Mass. 178, 185 (1995) (quoting *Turner*, 809 F.2d at 97). ("[P]laintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addresses the particular point at issue.").

Plaintiffs also contend that because the contract was forced upon them, its use as a defense to claims of misrepresentation is unfair.  To be sure, a fraudulently induced contract

cannot be used as a defense to fraud claims.  *See HSBC Realty,* 745 F.3d at 571 ("[A]

Massachusetts rule holds that one cannot induce a contract by fraud and then use contractual

contrivances to duck liability.").  However, the complaint does not plead fraudulent inducement,

and their other claim of procedural unfairness has already been rejected.

Finally, plaintiffs contend that the alleged fraudulent statements were not all oral.  To be

sure, there is language in older opinions suggesting that only oral statements are covered by the

doctrine.  *See, e.g., Turner*, 809 F.2d at 97 ("Certainly in this case, where both parties were

experienced in business and the contract was fully negotiated and voluntarily signed, plaintiffs

may not raise as fraudulent any prior *oral* assertion inconsistent with a contract provision that

specifically addressed the particular point at issue.") (emphasis added).  But recent caselaw has

made less of this distinction.  For example, in *HSBC Realty*, the fraud claims were based, in part,

on "two provisions in the project-loan agreement [alleged to] constitute false statements of

material fact made to induce [defendant] to sign the guaranty."  745 F.3d at 570.  The fact that

those alleged false statements were not oral was of no matter to the court.  *Id.* at 572–73.

Here, even if some of the alleged fraudulent statements were not oral, plaintiffs' reliance

was not reasonably justified.  The alleged representations were not concrete, specific written

statements for which confusion might be reasonable, but were made in broad, generalized

marketing materials.  In the context of these alleged representations, the distinction between oral

and written misrepresentations is not material.

In any event, even if the contract were not considered, defendants' alleged

representations consist of the type of vague, indefinite puffery that is generally not actionable.

Reliance is unreasonable as a matter of law where the alleged representations are vague or

indefinite.  *See Saxon Theatre Corporation*, 347 Mass. at 666–67 (no reasonable reliance for

purposes of plaintiff's claim of deceit where defendant's agreement to construct a theater and

lease it to plaintiff "left [so many details] for future negotiations"); *Warren H. Bennett, Inc. v.*

*Charlestown Savings Bank*, 3 Mass. App. Ct. 753, 753 (1975) ("[N]o actionable deceit is

alleged . . . as the representation allegedly relied upon was so indefinite and imprecise as to

render such reliance unreasonable as a matter of law").

Here, the alleged representations consist of broad statements regarding a Consultant's

future potential.  For example, one such statement is that "if a Consultant works hard and builds

his or her downline, then after a few years, the Consultant can sit back and enjoy a carefree

lifestyle."  (Amended Compl. ¶ 18).  Another is the touting of Vantel as "something that can

change the course of your life—in small ways and in earth-shattering ways" and an "opportunity

for unlimited income."  (*Id.* ¶¶ 19–21).  Such vague, aspirational statements cannot form the

basis for reasonable reliance.  Reliance on such vague statements is unreasonable as a matter of

law.  *See also Schott Motorcycle Supply, Inc. v. American Honda Motor Co.*, 976 F.2d 58, 65

(1st Cir. 1992) (holding that broad statements projecting increase in sales "in the context of

franchisor-franchisee communications constitute nothing more than 'puffing' or 'trade talk,'

upon which no reasonable person would rely."); *Saxon*, 347 Mass. at 667 ("[F]alse statements of

opinion, of conditions to exist in the future, or of matters promissory in nature are not

actionable" for claims of fraud.) (citations omitted).

Accordingly, Counts 6 and 7 will be dismissed.

**IV.    <u>Conclusion</u>**

For the foregoing reasons, defendant's motion to dismiss is GRANTED as to Counts 1, 4,

5, 6, and 7, and otherwise DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV

F. Dennis Saylor IV

Dated: July 14, 2020                    Chief Judge, United States District Court